IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

THOMAS RAYMOND MENEI,

      Petitioner,

v.                            Case No. 2:09-cv-01516

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATION

On December 17, 2009, Petitioner filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (docket sheet document # 1). This matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are Respondent's Motion for Summary Judgment and to Dismiss the Petition (# 11) and Petitioner's Motion for Stay and Abeyance (# 18).

## PROCEDURAL HISTORY

On May 8, 2001, Petitioner was indicted by a Fayette County Grand Jury on one count of Murder (Count One) and one count of Aggravated Robbery (Count Two). State v. Menei, Case No. 01-F-66. (# 11, Ex. 1). Petitioner was convicted of the murder charge, following a jury trial, on or about June 7, 2004. (Id., Ex. 2).

Following a bifurcated penalty phase of the trial, the jury did not recommend mercy and, on July 26, 2004, the trial court sentenced Petitioner to life in prison without the possibility of parole. (Id., Ex. 3).

Petitioner, by counsel, filed a Petition for Appeal concerning his conviction in the SCAWV on February 2, 2006, asserting the following assignments of error:

> 1.  The trial court abused its discretion when it granted the State's motion to bifurcate for the express purpose of putting before the jury evidence otherwise not admissible in a first degree murder case.
>
> 2.  The trial court erred in denying Defendant's motion for a new trial based on newly discovered Brady evidence because the trial court used the incorrect legal standard and failed to give any weight to the impeachment value of the discovered evidence.

(Id., Ex. 4).  The Petition for Appeal was refused by the SCAWV on March 15, 2006.  (Id.)

On August 15, 2007, Petitioner filed a Petition for a Writ of Habeas Corpus in the Circuit Court of Fayette County (Case No. 02-C-434).  (Id., Ex. 5).  The Circuit Court habeas petition raised the following grounds for relief:

> 1.  Ineffective assistance of counsel.
>
> 2.  Court erred in not giving defense team an in camera hearing when prosecution brought up 404(b) evidence.
>
> 3.  Court erred in not granting new trial when prosecution failed to turn over evidence favorable to defense.

2

      4.    Court erred when it allowed prosecution to use defendant's criminal history at trial.

By order entered on July 29, 2009, the Circuit Court addressed the merits of Petitioner's claims and denied the petition. (Id., Ex. 6).

On September 15, 2009, Petitioner filed a Petition for Appeal from the denial of his Circuit Court habeas corpus petition. The Petition for Appeal asserted the following errors:

      1.    Failure of the court to recognize motion to alter [sic; alter] or amend order denying Petitioner's motion for new trial.

      2.    Court erred in not granting defense motion to dismiss indictment against defendant after prosecution seeked [sic; sought a] writ of prohibition because Judge Hatcher's ruling dismissing evidence was so flagrant as to deprive state of prosecuting.

      3.    Ineffective assistance of counsel.

      4.    Trial court abused its discretion when it granted state's motion to bifurcate for the express purpose of putting before the jury evidence otherwise not admissible in a first degree murder case.

      5.    The court erred in denying defendant's motion for a new trial based on newly discovered Brady evidence because the trial court used the incorrect legal standard and failed to give any weight to the impeachment value of the discovered evidence.

(Id., Ex. 7).  On November 23, 2009, the SCAWV refused that petition.  (Id.)

Petitioner filed the instant petition under section 2254 on December 17, 2009, raising the same grounds that were raised in his habeas appeal, stated as follows:

3

      1.    Failure of the court to recognize motion to alert [sic; alter] or amend order denying Petitioner's motion for new trial.

      2.    Court erred in not granting defense motion to dismiss indictment of 01-F-66.

      3.    Ineffective assistance of counsel.

      4.    Court erred in granting state motion to bifurcate Petitioner's trial for the sole purpose of putting evidence before the jury, evidence otherwise not admissible in a first degree murder trial.

      5.    The court erred in denying defendant's motion for new trial based on newly discovered <u>Brady</u> evidence, trial court used the incorrect legal standard and failed to give any weight to the impeachment value of the discovered evidence.

(# 1).

On May 7, 2010, Respondent filed a Response to the Petition for a Writ of Habeas Corpus (# 10), a Motion for Summary Judgment, with accompanying exhibits (# 11) and a Memorandum in support thereof (# 12).

On May 21, 2010, Petitioner filed a Motion for Enlargement of Time to File a Response to the Motion for Summary Judgment and Motion to Dismiss (# 13).

On May 25, 2010, the undersigned entered an Order granting Petitioner's Motion for Enlargement of Time (# 14). In the same Order, and pursuant to the holding in <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), the undersigned advised Petitioner of his right and obligation to file a response to the Motion for Summary Judgment, and set deadlines for a response and reply (<u>Id.</u>)

4

On August 11, 2010, Petitioner filed a Motion for Extension of Time to Make Substantive Clarification of Petition for Writ of Habeas Corpus, in which Petitioner requested an additional 45 days to submit a "proper petition." (# 15).

On August 19, 2010, the undersigned granted Petitioner's second motion for extension of time, and set new deadlines for a response and reply to Respondent's Motion for Summary Judgment (# 16).

On October 1, 2010, Petitioner filed a Consolidated Response to Magistrate's Findings Ordering Clarification of Petition[1] and Respondent's Motion for Summary Judgment and Respondent's Motion to Dismiss (# 17). That same date, Petitioner filed a Motion for Stay and Abeyance (# 18).

On October 15, 2010, Respondent filed a Reply brief (# 18), and a Response to Petitioner's Motion for Stay and Abeyance (# 20). On November 2, 2010, Petitioner filed a Consolidated Rebutter [sic; Rebuttal] and Objections to Respondent's Reply and Response to Motion for Stay and Abeyance (# 21). On November 3, 2010, Respondent filed two supplemental exhibits (# 22). This matter is ripe for determination.

---

[1] The undersigned notes that no order or findings requesting clarification of Petitioner's Petition was ever entered by this court. The undersigned believes that Petitioner or the inmate assistant who has been assisting Petitioner with his filings may have used a document from another case and improperly modified it for this case.

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but

unreasonably applies that principle to the facts of the prisoner's case.  Id. at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  See, e.g., Blackledge v. Allison, 431 U.S. 63, 81 (1977); Maynard v. Dixon, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## STATEMENT OF FACTS AND TRIAL TESTIMONY

On January 1, 2000, Donald Vest was shot and killed in the parking lot of Weekend's bar in Oak Hill, Fayette County, West Virginia.  The only eyewitness to the crime was a man named Thomas James, who was so intoxicated he could not recall any of the events surrounding the murder.

7

Mr. Vest, a local businessman, was a patron at Weekend's bar on New Year's Eve. While Mr. Vest was at the bar, another patron named Thomas James was so intoxicated that he fell and injured himself. Mr. Vest assisted Mr. James and offered to take him home.

After the bar closed, around 3:00 a.m., the owner of the bar, Danny Sumpter, was locking up while Mr. Vest proceeded to his car with Mr. James. Mr. Sumpter heard a noise (like a click or a bang) that caused him to look out the window and he saw a man fall to the ground. Mr. Sumpter got in his own vehicle and drove over to the adjacent parking lot where Mr. Vest's vehicle had been parked. On his way to the scene, however, he saw Mr. Vest's Suburban go by him with Mr. James in the passenger seat and an unidentified driver. Sumpter testified that the driver was wearing a yellow jacket, but the hood of the jacket concealed the driver's face. (# 11, Ex. 8 at 212-222; 314-315).

When Sumpter arrived at the scene, he found Mr. Vest on the ground, with a gunshot wound to his chest. Mr. Vest's wallet, which contained over $400 in cash and a number of credit cards, and some other contents of Vest's pockets, were strewn across the parking lot. (Id. at 263-265, 312-313). Sumpter went to a nearby pay phone and called the police. (Id. at 230). Mr. Vest died on the parking lot. A short time later, Mr. James was found stumbling along the side of a nearby road, but he was so intoxicated, he was unable to recall any of the events of the evening. (Id. at 241-

8

245, 293-294, 327-328, 612-613).

Gary Sexton, a friend of Petitioner's, testified that, on the night of December 31, 1999, he and his girlfriend were at a party that was also attended by Petitioner and Jeanette Dotson, the mother of Petitioner's child.  According to several witnesses at trial, Petitioner and Dotson were extremely drunk and got into an altercation with some other people at the party and were asked to leave.  Sexton and his girlfriend, Vicki Ann Sisk, left with Petitioner and Dotson and went to the apartment that Petitioner and Dotson shared.  Sexton testified that they arrived there around 1:30 a.m.  (<u>Id.</u> at 491-492, 511-512).

Upon arriving at the apartment, Petitioner and Dotson began to argue.  Sisk testified that Petitioner was angry over the way Dotson had been treated at the party, and stormed out of the apartment.  (<u>Id.</u> at 492, 514).  According to Sexton and Sisk, when he returned a short time later, Petitioner had a small silver handgun with him.  Petitioner started waving the gun around and pointed it at both Dotson and Sexton.  (<u>Id.</u> at 492, 515).  Sisk became frightened and said she wanted to leave.  (<u>Id.</u> at 517).  Sexton took the gun from Petitioner, removed the clip and threw it into another room on the bed, and then he and Sisk left.  (<u>Id.</u> at 499-500).  Both Sexton and Sisk testified that they left shortly before 2:00 a.m., because they stopped to buy beer at a store about fifteen minutes from Petitioner's apartment, and beer sales stopped at 2:00 a.m.  (<u>Id.</u> at 500, 517).

Several law enforcement officers testified to seeing Petitioner in the Oak Hill area at various times before the murder, wearing what was described as a green and/or yellow hooded jacket. One officer testified that he had seen Petitioner walking towards Weekend's bar around 2:15 a.m., wearing a Green Bay Packers sweatshirt with a hood on it. (Id. at 254, 257, 291-292, 309-310, 603-605). Two of the officers testified that, shortly after seeing Petitioner in the area, they were called to the murder scene.

Jeanette Dotson testified that Sexton and Sisk drove them home, but she does not recall them leaving the apartment. (Id. at 857-859). The next thing that Dotson remembered was that Petitioner woke her up in the early morning hours of January 1 and told her he had killed someone and that he was afraid the police were coming for him. (Id. at 859-860).

Dotson stated that Petitioner told her he had taken a gun out of his brother's truck and went to the parking lot by "One Stop," tried to get Mr. Vest to give him his wallet and keys, and when Vest didn't comply, Petitioner shot him. (Id. at 867). Dotson further testified that Petitioner said he kicked Mr. James out of the moving vehicle as they left the crime scene. (Id. at 885-886). The next day, Mr. Vest's vehicle was located in front of a house near Petitioner's residence. (Id. at 329, 612, 671). Petitioner told Dotston that he had hidden something in a neighbor's flower pot. (Id. at 861-862). Ms. Dotson did not report what Petitioner had told her to the police. (Id. at 859-60).

10

Later in the day on January 1, 2000, Petitioner's brother, Mickey Menei, reported to police that a 380 Lorcin handgun had been stolen from his truck.  (Id. at 578-580).  The investigation in this case immediately focused on Petitioner because he had been seen in the area around the time of the murder wearing a jacket that met the description given by the only coherent eyewitness, Danny Sumpter, the owner of Weekend's.

On January 1, 2000, investigators went to Petitioner's apartment.  When they knocked on the door, Jeanette Dotson answered and told the police that Petitioner was not there.  The police returned to magistrate court to obtain a search warrant and, at that time, they found out that there was an outstanding capias for Petitioner for failure to post bond on an unrelated charge.  Police returned to Petitioner's home ostensibly to execute the capias. When the officers entered the apartment, they found Petitioner asleep in bed.  They also located a green and yellow hooded jacket soaking in the bathtub and a pair of jeans on the floor.

The police maintained surveillance on the apartment and returned to magistrate court to obtain a search warrant based upon the strength of the evidence they had seen when executing the capias.  The search warrant was issued for Petitioner's home and person, and the police returned and seized the garments from the bathroom, and arrested Petitioner.  They performed gunshot residue testing on Petitioner and the clothes recovered from the apartment. Petitioner was housed at the Southern Regional Jail ("SRJ") on the

11

charges that were the subject of the capias.

Testing later revealed that the powder residue tests performed on Petitioner were positive and a substance identified on Petitioner's jeans matched the seats of Mr. Vest's vehicle. In April of 2000, Petitioner was released from the SRJ because the capias was determined to be an illegal authority for the arrest. Because the capias was issued in error and not enforceable, the trial court later ruled that all of the evidence seized pursuant to the search warrant were the product of an illegal search and suppressed all of that evidence. Thus, this evidence was not presented to the jury, who also heard no evidence about the time period in which Petitioner was incarcerated at the SRJ. (# 11, Ex. 9 at 1-4).

According to Jeanette Dotson, in April of 2000 (after his release from jail), Petitioner sought out his father and told him that he had killed Vest. (# 11, Ex. 8 at 868). According to Dotson, sometime thereafter, Petitioner's father drove Petitioner, Dotson, and a man named Darrell Cadle to Statesville, North Carolina, and gave them $200 in cash. Petitioner's father then returned to West Virginia. (Id. at 871-872).

Dotson further testified that, while they were in Statesville, Petitioner attempted to sell the murder weapon on the street to an unnamed local resident. (Id. at 872-875). During the course of the alleged sale, Petitioner and Dotson and a black male were observed by local law enforcement officers. As the officers

approached them, one of the three appeared to toss away an
unidentified object.  The officers testified that they could not
see what was tossed away, but a .380 Lorcin handgun was found near
them.  Petitioner, who lied about his identity to the officers, was
arrested on felon in possession charges and released on a PR bond,
a fact that was not revealed at trial.  (Id. at 785-797).

While Petitioner and the others were in North Carolina,
Dotson's mother was questioned by police and she told them that she
believed that Petitioner and Dotson were in North Carolina, where
they had been picked up by law enforcement.  (Id. at 634).  Local
investigators contacted authorities in North Carolina who informed
them that Petitioner had been arrested and released, and that they
were still in possession of the .380 Lorcin handgun and four
unspent casings seized during the arrest.  (Id. at 637-638).

Investigators retrieved the gun from North Carolina and
submitted it, along with the casing located at the scene of the
murder and the slug recovered from Mr. Vest's body, to the West
Virginia State Police for ballistics testing.  (Id. at 417-418,
638-641).  The testing was inconclusive (id. at 670-671), so the
evidence was submitted to the FBI for more sophisticated testing.
The FBI's test results matched the gun recovered from North
Carolina to the slug and casing recovered from the murder scene.
(Id. at 638-54, 696).  The State Police report also indicated some
difficulty with the operation of the firearm; the FBI, however, did
not encounter such a problem.  (Id. at 716-717).

13

Petitioner was indicted for the murder of Donald Vest in May of 2001.  In early 2002, Jeanette Dotson agreed to testify in exchange for reduced charges on a felony welfare fraud charge.  At that time, she told police that, after Petitioner was arrested on the capias, she went and found the clip from the gun and Mr. Vest's keys in their neighbor's flower pot, where Petitioner said he had put them, and she threw them out her car window towards a fence line on a nearby road.  (Id. at 862-864).

Investigators went to the area where Dotson said she threw those items.  When they asked the property owner, Bruce Coleman, if they could search his property and told him what they were looking for, he told them that he had found some keys the previous fall. He gave them the keys, which matched Mr. Vest's vehicle.  The keys were introduced into evidence at trial.  (Id. at 590-592).

Gary Sexton and Vicki Ann Sisk testified that the gun recovered from North Carolina looked like the gun they had seen Petitioner with on the night of the murder.  (Id. at 492-493, 516). Mickey Menei was unable to identify the gun as the one he reported missing the day after the murder (id. at 583-584), but admitted that the gun was of the same caliber as the one stolen from him, and that he lived in close proximity to Petitioner's apartment. (Id. at 577-580).

In Petitioner's case in chief, Petitioner's father, Raymond Menei, testified that he arrived at Petitioner's apartment around 11:30 p.m. on December 31, 1999, where Petitioner and Dotson were

14

the only others present at that time.  Mr. Menei testified that
Dotson was intoxicated and causing a disturbance, so Petitioner
told her to leave the apartment.  Mr. Menei says that she left
around 12:30 a.m.  (<u>Id.</u> at 967-969).  Mr. Menei further testified
that, at some point, he and Petitioner left the apartment to go get
cigarettes at "Pit Row" (which is in the vicinity of the crime
scene), but they returned to the apartment, and Mr. Menei left
around 1:30 a.m.  He stated that Dotson had not returned at that
time.  (<u>Id.</u> at 970).

Mr. Menei further testified that Dotson told him that
Petitioner had told her that he killed someone; however, Mr. Menei
denied ever hearing Petitioner confess to this crime.  (<u>Id.</u> at 971-
973).  He also denied driving Petitioner, Dotson and Cadle to North
Carolina.  (<u>Id.</u> at 973).

Petitioner also presented the testimony of Raymond Johnson,
who lived in the house where Mr. Vest's vehicle was found.  Johnson
testified that, when he returned home from New Year's Eve
festivities, the vehicle was parked in front of his house with the
parking lights on and he thought it might be running.  Johnson
stated that he called the Oak Hill Police about the vehicle, but
got no response.  (<u>Id.</u> at 980-983, 987-988).  Johnson also
testified that he was a friend of Jeanette Dotson.  (<u>Id.</u> at 982-
985).

After being advised of his rights, Petitioner indicated that
he had discussed the matter with his lawyers and elected not to

testify.  (Id. at 1010-1013).

The State's motion to bifurcate the penalty phase of Petitioner's trial was granted.  Petitioner was found guilty of first degree murder by the jury.  (Id. at 1130-1132).  At the sentencing proceeding, the State introduced evidence of Petitioner's three prior felony convictions for violent crimes in Fayette, Raleigh, and Monongalia Counties in West Virginia.  The convictions were for felony fleeing under the influence of alcohol, unlawful assault, and aiding and abetting non-aggravated robbery. (Id. at 1159-1171).  No mitigating evidence was presented by the defense.  (Id. at 1177).  The State argued that Petitioner was a violent, dangerous offender who was unlikely to be rehabilitated. (Id. at 1182-1185).

The jury returned a sentence of life without mercy.  Thus, Petitioner was sentenced to life in prison without the possibility of parole.  (Id. at 1191).

## ANALYSIS

### A.   Petitioner's Motion for Stay and Abeyance.

After Respondent filed his Motion for Summary Judgment, which asserted that at least one of the grounds raised in Petitioner's section 2254 petition was unexhausted, Petitioner made a request to stay his federal petition to allow him to return to the state courts to exhaust any available remedies concerning unexhausted claims contained in his section 2254 petition.  Petitioner's only basis for the stay and abeyance is that he was not provided counsel

16

or an evidentiary hearing in his state habeas proceedings.  (# 18 at 1).

Respondent filed a Response in Opposition to the Motion for Stay and Abeyance, which asserts in pertinent part:

> In his Motion, Petitioner agrees with Respondent's contentions . . . that Petitioner has not exhausted all of his claims in state court.  Specifically, Respondent asserted that Ground One of the petition was not presented to the Circuit Court of Fayette County for adjudication, but was raised for the first time in his habeas appeal to the [SCAWV][footnote omitted].  Thus, Respondent argued that the claim was not properly exhausted, and because Petitioner had already had one full round of state habeas proceedings it was now procedurally barred from federal habeas review [footnote omitted].

> However, as discussed in "Respondent's Reply to Petitioner's Response to Respondent's Motion for Summary Judgment (hereinafter "Respondent's Reply [footnote omitted], Petitioner's claim in Ground One of the Petition has no factual basis.  Neither the docket sheet in Petitioner's criminal case [footnote omitted], nor the records of those proceedings received from the Fayette County Circuit Clerk, contain any reference to a "Motion to Alter or Amend Judgment" filed by Petitioner following the circuit court's denial of his Motion for a New Trial.  Thus, the circuit court could not have "failed to recognize" a motion that was never filed by the Petitioner.

> Moreover, even when Petitioner first raised this claim in his state habeas appeal, he made no reference to any motion for reconsideration, but simply argued that some of the factual findings of the state court in denying his motion for a new trial were erroneous. [Footnote omitted].  As more fully discussed in Respondent's Reply, even if this issue were properly exhausted, Petitioner's challenge to the adequacy of his state post-conviction proceedings is not cognizable in federal habeas corpus.  Consequently, there would be no point in staying these proceedings to provide Petitioner with an opportunity to exhaust his state remedies on a ground that fails to state a claim upon which relief can be granted and should instead be dismissed.

(# 20 at 2-3).  Respondent further argued that Petitioner has not shown good cause for his failure to exhaust all of his claims in the state courts, and that there is no justification for staying these proceedings.  (Id. at 3).

The Supreme Court addressed the appropriateness of staying a section 2254 petition in Rhines v. Weber, 125 S. Ct. 1528, 1535 (2005).  The Court granted certiorari to resolve a circuit split, and held that a district court has discretion to stay a mixed habeas petition to allow a petitioner to present his unexhausted claims to the State court, but only in limited circumstances.  As noted by Respondent, the Rhines Court held:

> Stay and abeyance should be available only in limited circumstances.  Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines that there was good cause for the petitioner's failure to exhaust his claims first in the state court.  Moreover, even if a petitioner had a good cause for that failure, *the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless*.

544 U.S. at 277 (emphasis added).  (# 20 at 4).

Respondent argues that, even if Petitioner could demonstrate "good cause" for his failure to exhaust Ground One of his petition, the court should still deny his motion because the claims in Ground One are "plainly meritless."  (Id. at 5).  Respondent further states that "Petitioner offers no argument or evidence to demonstrate that the circuit court failed to recognize any motion to alter or amend the order denying Petitioner's motion for a new

18

trial.  As previously discussed, there is no such evidence of such a motion on the Fayette County Circuit Court docket sheet or in the circuit court record." (Id.)  Respondent further notes that, in Ground One of his section 2254 petition, Petitioner essentially "picks apart the Order Denying the Motion for a New Trial and asserts that the circuit judge misstated facts from the record" and "offers no legal support for his contentions." (Id.)

As will be discussed in much greater detail below, 28 U.S.C. § 2254(b)(2) provides that a section 2254 petition may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in courts of the state.  Based upon the Supreme Court's holding in Rhines, and the undersigned's proposed findings, infra, that the claims raised in Ground One of Petitioner's section 2254 petition lack merit and should be dismissed, notwithstanding non-exhaustion, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated good cause for a stay and abeyance in this case.

**B.  Ground One - Failure to Recognize Motion to Alter or Amend Judgment and Denial of Motion for New Trial.**

As noted above, in Ground One of his section 2254 petition, Petitioner asserts that the trial court failed to recognize Petitioner's Motion to Alter or Amend Order and to correct "inadvertencies" in the court's Order Denying Petitioner's Motion for a New Trial.  (# 1 at 34).  In support of this claim, Petitioner asserts that, on December 8, 2004, the attorney who was

19

representing him on his appeal filed a Motion for a New Trial based upon the State's failure to disclose a statement made by Darrell Cadle, the gentleman who traveled to North Carolina with Petitioner and Dotson. This statement was taken on June 1, 2004, just prior to Petitioner's trial and was not disclosed to the defense prior to the trial. As noted in Petitioner's petition, several evidentiary hearings were held by the trial court and, on September 21, 2005, the court denied Petitioner's Motion for a New Trial.

Petitioner has taken issue with some of the factual findings made in the Order Denying the Motion for a New Trial. Specifically, Petitioner states that Judge Hatcher's Order Denying the Motion for a New Trial stated that, when Petitioner was arrested in North Carolina, a Lorcin .380 caliber semi-automatic pistol was recovered at Petitioner's feet. Petitioner contends that the officer from North Carolina who testified at his trial testified that the firearm was located on the ground where one of the subjects (a Black male) was walking and that they didn't see any of the subjects with the gun. (# 1 at 34-35). Petitioner also contends that Judge Hatcher's Order mis-states that Petitioner's brother, Mickey Menei, identified the .380 caliber pistol that was retrieved from North Carolina as his gun that he had reported stolen on the day of the murder. (Id. at 35-36).

Petitioner also takes issue with Judge Hatcher's conclusion of law finding that the statement by Darrell Cadle that the State

failed to turn over to the defense prior to trial was not material to either Petitioner's guilt or punishment, and that it was only relevant to establish evidence of Petitioner's flight to North Carolina. Petitioner asserts that Cadle's statement established that Petitioner's father did not drive Petitioner, Dotson and Cadle to North Carolina, that Petitioner did not have a gun with him on that trip, and that Petitioner told Cadle that he did not kill Mr. Vest. Petitioner further asserts that Cadle's statement contradicted the testimony of Jeanette Dotson, the key witness for the State. Thus, Petitioner contends that the Cadle statement was crucial impeachment evidence against Dotson, and supported Petitioner's innocence.

As noted by Respondent above, Petitioner asserts that Judge Hatcher "failed to recognize" a Motion to Alter or Amend the Order Denying the Motion for a New Trial. However, it is clear from the docket sheet in this matter that Petitioner did not file a Motion to Alter or Amend the Order Denying the Motion for a New Trial. Moreover, in Ground Three of his section 2254 petition concerning ineffective assistance of counsel, Petitioner faults his trial counsel for <u>not</u> filing a Motion to Alter or Amend the Order Denying the Motion for a New Trial. Thus, there is no merit to Petitioner's claim that the trial court "failed to recognize" such a motion.

A closer look at Petitioner's claim reveals that he is actually challenging the factual and legal findings of the trial

court in the Order Denying the Motion for a New Trial.
Respondent's Motion for Summary Judgment summarizes this claim as
follows:

> In ground one, Petitioner claims, essentially, that
> the trial court relied on incorrect facts when it denied
> his motion for a new trial. Petitioner cites findings in
> the court's order denying the motion that were
> inconsistent with facts developed at trial. Petitioner
> argues that because the trial court relied on incorrect
> facts to decide whether to grant a new trial it ruled in
> error. Petitioner, however, fails to account for the
> fact that the judge who ruled on the motion for a new
> trial also presided over the trial court presided over
> the trial court proceedings and had the record before
> him.

(# 12 at 18).

Respondent asserts that this claim is solely a challenge to
the evidence the state court relied upon in denying a post-trial
motion. Respondent's Memorandum of Law further states:

> In support of this argument, Petitioner cites to findings
> in the trial court's order, that were somewhat
> inconsistent with facts introduced at trial. Petitioner
> fails to argue, though, how the trial court's ruling in
> *post-trial* proceedings effected any due process or
> effected the fairness of the proceedings that actually
> resulted in his conviction as required to implicate
> either due process or the Sixth Amendment. Federal
> habeas corpus lies to ensure that a defendant is
> incarcerated following a fair trial that satisfies due
> process. "In conducting habeas review, a federal court
> is limited to deciding whether a conviction violated the
> Constitution, laws or treaties of the United States."
> Estelle v. McGuire, 502 U.S. 62, 68 (1991). A post-
> conviction or post-trial proceeding, following a fair
> trial, that does not implicate due process cannot form
> the basis for habeas corpus relief. See Herrera v.
> Collins, 506 U.S. 390 (1993). "Where, as here, a
> defendant has been afforded a fair trial and convicted of
> the offense for which he was charged, the constitutional
> presumption of innocence disappears. Federal habeas
> courts do not sit to correct errors of fact, but to

ensure that individuals are not imprisoned in violation
of the Constitution." <u>Id.</u> at 390.

(<u>Id.</u> at 19).

Petitioner's Response to the Motion for Summary Judgment (#
17) does not address the merits of any of Petitioner's claims for
relief.  Rather, Petitioner focused his efforts on requesting that
this federal court stay his section 2254 petition to allow him to
return to state court to exhaust his remedies concerning all of the
claims raised in his section 2254 petition, and implied that he
would attempt to exhaust state court remedies concerning <u>additional</u>
claims for relief because he "has not had an attorney, at any
proceeding, to present the LOSH LIST required in State Court
proceedings (See, Losh v. McKinzie [sic; McKenzie], 277 S.E.2d 606
(1981) necessary to achieve exhaustion, and that some issues are
admittedly new and at least one is unexhausted (several others need
raised)."  (# 17 at 2).  Petitioner also claims that he was not
given a hearing in his state court habeas proceeding to prove his
claims of ineffective assistance of counsel.  (<u>Id.</u>)  As noted above
in addressing Petitioner's separate Motion for Stay and Abeyance (#
18), Petitioner has not demonstrated good cause for a stay of these
proceedings to allow him to return to the state courts to attempt
exhaustion of the claims in Ground One of the instant petition.

Respondent's Reply opposes any further delay in the
adjudication of these proceeding.  The Reply further addresses
Ground One as follows:

> After further review of the record in this matter, counsel for Respondent has discovered that Petitioner's claim in Ground One of the Petition has no factual basis. Neither the docket sheet in the Petitioner's criminal case [FN 8 - *See* Resp't Ex. 12, filed herewith], nor the records of those proceedings received from the Fayette County Circuit Court, contain any reference to a "Motion to Alter or Amend Judgment" filed by Petitioner following the circuit court's denial of his Motion for a New Trial. Thus, the circuit court could not have "failed to recognize" a motion that was never filed by the Petitioner.
>
> Moreover, even when Petitioner first raised this claim in his state habeas appeal, he made no reference to any motion for reconsideration, but simply argued that some of the factual findings of the state court in denying his motion for a new trial were erroneous. [FN 9 - *See* Resp't Ex. 7, Petition for Appeal at pp.16-24]. Even if this issue were properly before this Court, Petitioner's challenge to the adequacy of his post-conviction proceedings is not cognizable in federal habeas corpus. Ground One of the Petition should therefore be denied and dismissed for failure to state a claim upon which relief can be granted.

(# 19 at 3).

The undersigned agrees that the Petitioner's claim as pled in Ground One of his section 2254 petition is unexhausted. However, 28 U.S.C. § 2254(b)(2) provides that a section 2254 petition may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in courts of the state. Ground One of Petitioner's section 2254 petition consists of a challenge to the trial court's findings concerning evidence used to deny Petitioner's post-trial motion. In particular, Petitioner contends that Judge Hatcher incorrectly found that the Lorcin 380 pistol recovered in North Carolina was found "at Petitioner's feet," when, in fact the officer who testified about this incident stated that

a black male was closest to the gun and they could not determine who had the gun. (# 1 at 34-35). Petitioner also challenges Judge Hatcher's finding that Petitioner's brother, Mickey Menei, identified the gun recovered in North Carolina as the gun he had reported stolen from his truck when, in fact, Mickey Menei testified that he could <u>not</u> identify the gun as his. (<u>Id.</u> at 35).

Petitioner also asserts that several of Judge Hatcher's findings of fact and conclusions of law concerning a statement given by a man named Darrell Cadle were clearly wrong. First, Petitioner asserts that Judge Hatcher incorrectly found that the statement of Darrell Cadle, which was not disclosed to Petitioner before trial, was not material to Petitioner's guilt or punishment, and was only relevant to the issue of Defendant's flight to North Carolina. (<u>Id.</u> at 36). This issue is the subject of Ground Five of Petitioner's section 2254 petition and will be further addressed <u>infra</u>.

Finally, in Ground One, Petitioner challenges Judge Hatcher's finding that the evidence presented at Petitioner's trial was sufficient for a reasonable juror to conclude that Petitioner was guilty beyond a reasonable doubt. (<u>Id.</u> at 39). Petitioner contends that the only evidence to support a finding that he committed the crime was the testimony of Jeanette Dotson, and the evidence that a gun, which is purported to be the murder weapon, was found in his vicinity in North Carolina. (<u>Id.</u>) Petitioner claims that there is a dispute between the expert from the West

Virginia State Police Crime Lab, who found that the weapon "won't extract" and the FBI expert who found that the weapon functioned normally and was a match to the weapon used to kill Mr. Vest. (Id.)   Petitioner also states that there was a discrepancy concerning the weight and caliber of the bullets when the gun was tested by the West Virginia lab versus when it was tested by the FBI.   (Id.)   Petitioner says that this evidence is "highly questionable."   (Id. at 41).

Despite the fact that Petitioner has not exhausted all of the issues addressed in Ground One of his section 2254 petition, the undersigned proposes that the presiding District Judge **FIND** that the issues addressed in Ground One lack merit and the petition should be denied on those grounds.   Petitioner's claims in Ground One are a combination of a challenge to the sufficiency of the evidence presented at trial, which is a cognizable claim, and a challenge to his state post-conviction proceedings, which is not cognizable.

To the extent that Petitioner is challenging the sufficiency of the evidence used to convict him at trial, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   Jackson v. Virginia, 443 U.S. 307 (1979).   Based upon a review of the entire record before the court, the undersigned proposes that the presiding District Judge **FIND** that there was

26

sufficient evidence to support Petitioner's conviction of first degree murder.

In addition to the testimony of Jeanette Dotson, and the evidence concerning the purported murder weapon, there were other witnesses who placed Petitioner in the vicinity around the time of the crime, wearing clothing that matched the description of the person who was driving the victim's vehicle. Furthermore, the victim's vehicle was found in the vicinity of Petitioner's apartment. And there was additional witness testimony that established that Petitioner had a gun in his possession in the hours before the murder.

For these reasons, and for reasons to be discussed _infra_ concerning Ground Five of Petitioner's section 2254 petition, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate a violation of his federal constitutional rights on any basis discussed in Ground One, that the state courts' decisions were neither contrary to, nor an unreasonable application of clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground One of Petitioner's section 2254 petition.

### C. Ground Two - Failure to grant motion to dismiss indictment.

In Ground Two of his section 2254 petition, Petitioner contends that the trial court erred in not granting Petitioner's motion to dismiss the indictment after the trial court suppressed

27

evidence, and the state unsuccessfully sought a writ of prohibition arguing that the state would be deprived of the ability to prosecute Petitioner without the use of that evidence.  Petitioner contends that the prosecutor's change of position from arguing for the writ of prohibition and swearing under oath that he could not prosecute Petitioner without the suppressed evidence, to his position at trial that there was sufficient evidence to convict Petitioner contravened the prosecutor's ethical and legal obligations, and violated Petitioner's due process rights.  (# 1 at 42-52).

Respondent's Memorandum of Law addresses this claim as follows:

> In support of this claim, Petitioner cites to a petition filed in the West Virginia Supreme Court by the State seeking a writ to prohibit the trial court from entering the suppression order.  (Resp't Ex. 9). Petitioner cites to arguments raised by the State in support of the writ claiming that if the crucial evidence obtained during the search were suppressed the State's ability to prosecute the case would suffer a "fatal" blow.  (Id. at 3.)  Petitioner argues that because the prosecutor made statements claiming that the State would not be able to pursue prosecution without the suppressed evidence, the trial court should have granted the defense's motion to dismiss the indictment after the West Virginia Supreme Court refused to grant the writ.

> Petitioner also cites to pages of ethical canons evidently for the proposition that because the prosecutor is ethically bound to be truthful, the trial court should have taken the petition for writ of prohibition as prima facie evidence to dismiss the indictment.

> Again, Petitioner challenges a trial court ruling which fails to raise a due process challenge to the proceedings.  As such it fails for a number of reasons, including 1) the ruling of the trial court did not effect

28

the fairness of the trial or deny Petitioner due process;
2) the ruling was a matter of a state court interpreting
and applying state law and it is not the duty of federal
reviewing courts to examine state law and determine if it
was properly applied by a state court and 3) there is no
federal right to an indictment for state prisoners and
any issue challenging the indictment under the state law
implicates no federal right.

* * *

In order for the trial court to rule on the motion
to dismiss the indictment, it was required to examine the
statute Petitioner was charged under and determine
whether the State had sufficient evidence to prosecute.
Any such determination rested on the State's case in
light of the relevant statute and rested on a mixed
question of state law and the facts of the case.  As such
the court's decision amounted to a state court
determination on a state law issue and is not subject to
review by this Court.

(# 12 at 21-22).

Petitioner's Response (# 17) and Respondent's Reply (# 19) do

not specifically address this claim.

It appears that Petitioner did not specifically raise this

claim in either his direct appeal or in his Circuit Court habeas

petition.  However, the State habeas court made the following

findings of fact in its Order denying habeas relief:

> 28.  By Order entered June 17, 2003, the Petitioner's
> motion to suppress all direct and derivative
> evidence obtained as a result of alleged unlawful
> searches and seizures was granted.  The Court
> concluded as a matter of law that the capias upon
> which the Petitioner was arrested had been issued
> without probable cause, thus, the search warrants
> were a nullity. (The Oak Hill police, while inside
> the Petitioner's apartment without any lawful
> authority, saw certain matters therein, upon which
> they then obtained two search warrants.)

* * *

29

31.   On July 10, 2003, the State filed its "Petition for Writ of Prohibition," seeking to prohibit the enforcement of the June 17, 2003 Order which granted the Petitioner's motion to suppress all direct and derivative evidence obtained from the aforementioned unlawful search and seizure. Said Writ was refused by the Supreme Court of Appeals of West Virginia.

32.   On October 1, 2003, in light of the Supreme Court's aforementioned refusal to grant its petition for a writ, the State filed a "Motion for Reconsideration" in the trial court.

33.   On October 7, 2003, the Petitioner filed a "Response in Opposition to Motion for Reconsideration."

34.   By order entered November 12, 2003, the Court denied the State's motion for reconsideration, finding that the Court's earlier ruling, memorialized in a June 17, 2003 Order was factually and legally correct.

35.   On November 24, 2003, the Petitioner moved to dismiss the indictment.

36.   By order entered December 4, 2003, the trial of the Petitioner was scheduled to commence on February 2, 2004.

37.   By Order entered December 15, 2003, pursuant to a hearing held December 3, 2003, the Petitioner's motion to dismiss the indictment was denied.

                            * * *

39.   By Order entered January 29, 2004, the Defendant's Motion to Continue was granted. The Court took judicial notice of the aforementioned Petition for a Writ of Prohibition by the Defendant and the response filed by the State. The Defendant's trial was continued generally pending a ruling by the Supreme Court of Appeals. Said Writ was subsequently denied by the Supreme Court of Appeals.

(# 11, Ex. 6). The State habeas court's Order did not further

30

address the denial of the motion to dismiss the indictment.

Petitioner raises this claim as a matter of trial court error. However, Petitioner further states that, "as a matter of accountability, fundamental fairness and due process (Amendment XIV of the United States Constitution and Article III, Section 10 of the West Virginia Constitution) [the prosecutor] cannot now proceed on a path (trial), in contravention of a prior legal/ethical assertion. (# 1 at 44). This is the only time Petitioner mentions due process in the context of this claim.

Moreover, Petitioner did not exhaust this claim in either his direct appeal or in his state habeas proceedings. Accordingly, this claim could be dismissed for non-exhaustion. However, as noted above, under section 2254(b)(2), a claim in a section 2254 may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the state courts. 28 U.S.C. § 2254(b)(2). Such is the situation with this claim.

As noted by Respondent:

[T]here is no federal constitutional right to an indictment for state prisoners. Therefore, an indictment that otherwise satisfies due process cannot render the trial itself unfair. Hurtado v. California, 110 U.S. 516, 534-35 (1984); see United States v. Mechanik, 475 U.S. 66 (1986)("the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation." (Id. at 73.)) United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1991)(Unless the alleged errors deprived a criminal defendant of the fundamental concepts of a fair trial, due process is not violated.). Any issue as to whether there was sufficient evidence to sustain the indictment was answered by the jury in its verdict.

31

(# 12 at 22).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim in Ground Two of his section 2254 petition fails to demonstrate that Petitioner's trial was fundamentally unfair, or that his due process rights were denied, when the trial court denied his motion to dismiss the indictment. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

### D.   Ground Three - Ineffective Assistance of Counsel claims.

In Ground Three of his section 2254 petition, Petitioner first claims that his trial counsel provided ineffective assistance at the trial phase because they failed to call witnesses that Petitioner contends would have been beneficial to his case. Petitioner speculates about what these witness could have testified to and that such testimony would have effected the outcome of the trial. (# 1 at 53-54). As noted by Respondent, Petitioner further suggests how such witnesses could have and should have been cross-examined by trial counsel in order to cast doubt on the credibility of the State's witnesses, in particular, Jeanette Dotson, the State's chief witness, and failed to cast her as the actual killer. (# 12 at 22-23).

In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel. A defendant must show (1)

32

that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard." Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).  Using this standard, and based upon all of the evidence of record, the court will address the merit of each of the allegations concerning ineffective assistance of counsel presented by Petitioner.

Petitioner claims that Jeanette Dotson's mother, Dreama Dotson, told Petitioner and his father, Raymond, that Jeanette had the gun in question in her possession and brought it to Dreama Dotson's house in a laundry basket.  (# 1 at 53).  Petitioner contends that this statement contradicts Jeanette Dotson's testimony that she never had the weapon.  (Id.) Petitioner further asserts that William Yoke Gray could have testified that he taught Jeanette Dotson how to fire a weapon.  (Id.) Petitioner further contends:

> During the statement Mrs. Jeanette Dotson gave to Officer
> Kessler at the Regional Jail, Mrs. Jeanette Dotson stated
> she was not familiar with weapons and how they work.  At
> Walter Lee Swafford['s] trial[,][2] Jeanette Dotson
> testified she was firing a weapon off the back porch of

---

[2] This was apparently some other criminal trial in which Dotson had previously testified.

her trailer, contradicting her own statements to Officer
Kessler.

(Id. at 53-54).

Respondent's Memorandum of Law specifically addresses these
claims as follows:

> If Dotson's mother had in fact testified that she
> saw her daughter with the murder weapon it would have
> proven one thing -- Jeanette Dotson had the murder weapon
> in her possession and was less than forthcoming on that
> point at trial.  It would not have proven she was the
> killer.  If trial counsel had called a witness to testify
> that he'd taught Dotson how to fire a gun it would have
> proven one thing -- that Jeanette Dotson knew how to fire
> a gun.  None of the speculative testimony even if true,
> would have been sufficient to overcome the State's
> remaining evidence to corroborate Dotson's testimony.

(# 12 at 27).

Petitioner further asserts that his counsel was ineffective
because they failed to properly cross-examine Jeanette Dotson about
her statements to Officer Kessler.  Specifically, Petitioner
contends as follows:

> 3.   Attorneys['] failure at trial to properly question
>      Jeanette Dotson about her statements to Officer
>      Kessler, such as Mrs. Dotson stating that she got
>      keys and clip to gun off neighbor's porch and
>      Defendant didn't tell her it was there, so how did
>      she know to look thier [sic; there] unless she put
>      them thier [sic; there]!

(# 1 at 54).  Petitioner raises three other claims of ineffective
assistance of counsel:

> 4.   Failure for attorney to object when Darrell
>      Cadle['s] name was mentioned by Mrs. Dotson at
>      trial, because we never heard that before.

> 5.   Failure of attorney to have Mr. Rocky Lane's
>      personal notes read into the trial because of Mr.

Lane's death we could of did that and the jury
would of heard that when Mr. Lane tested the weapon
it would not eject or perform properly and also Mr.
Lane stated it was a 380 bullet [sic; bullet] with
a different wieght [sic; weight] and calibur [sic;
caliber] than what the FBI lab had suggested and
also FBI Lab stated the gun worked perfectly
exactly the opposite of what Mr. Lane stated, and
would also had shedded [sic; shed] light that the
weapon had been tampered with while in Mr. Tygert's
personal possession!

6.    Failure for attorney to file a motion to alert
[sic; alter] or amend order to correct the
inadvertencies of the court and to render an
opinion on the factual and legal errors, and to
reconsider its legal conclusion:

On the 21st September 2005 Judge Hatcher denied
Motion for New Trial and gave a Findings of Fact
which were incorrect.

No. 4 on the Finding of Fact your honor stated the
loricin [sic; Lorcin] pistol was found at
Defendant's feet, that was never testified to,
prosecutor said that during closing arguments. It
was testified by a police officer that Defendant
was inn the facinity [sic; in the vicinity] where
the weapon was found.

No. 5 on the Finding of Fact is incorrect.
Defendant's brother Mickey Menei never identified
the weapon in[] question as belonging to him.
Mickey Menei stated it was like his, but can't
identifie [sic; identify] it as being his weapon.

No. 21 Raymond Menei['s] testimony also differed
from Jeanette Dotson['s] testimony on how Menei got
to North Carolina.

(# 1 at 54-56).

Respondent's Memorandum of Law further states:

At trial, counsel vigorously attacked the
credibility of all of the witnesses including Jeanette
Dotson. There were several inconsistencies in the
testimony of all of the witnesses including law
enforcement. Almost every civilian witness was

35

intoxicated to varying degrees on the night of the crime
and the trial was almost four years after the fact.
Trial counsel challenged the recollections and propriety
of the investigators regarding test results, the chain of
evidence and the evidence introduced at trial.  As a
result of trial counsel's diligence, several key pieces
of evidence were suppressed.

* * *

It's unclear from Petitioner's claim how trial
counsel was supposed to impeach Dotson with cross-
examination of Petitioner's brother and father since the
father flatly denied Dotson's version of events in his
direct testimony.  Petitioner's brother never testified
to anything more than reporting the gun stolen.  He did
not even identify the gun as belonging to him nor did he
claim Petitioner had stolen it.  Trial counsel could
hardly overcome the police report Mickey Menei filed
before he knew his brother had used it to kill Mr. Vest.

(# 12 at 27-28).

The state habeas court made the following findings of fact in

its Order denying Petitioner habeas corpus relief:

43.  The State, at trial, called 24 witnesses, including
Jeanette Dotson (hereinafter Dotson), the former
girlfriend of the Petitioner herein.  Petitioner's
trial counsel conducted extensive cross-examination
of each and every one of the State's witnesses.
Further, during the cross-examination of Dotson,
defense counsel presented to the jury several,
significant facts seeking to undermine her
credibility.  Defense counsel presented, and had
admitted in evidence, Dotson's plea agreement with
the State, which provided for a plea of guilty to a
misdemeanor crime of welfare fraud (a reduction of
the charged crime of felony welfare fraud); the
State's recommendation of probation at sentencing;
protection from any prosecution in regard to the
death of Donald Vest, the victim in the
Petitioner's criminal trial; and the dismissal of
felony unlawful assault charges pending against
her, in exchange for her cooperation in the
prosecution of the Petitioner. Defense counsel was
further able to present, with significant emphasis,
Dotson's past history of untruthfulness with law

36

enforcement officials and her prior testimony in which she had admitted to lying. Trial Transcript Volume III, pages 916-926.

44. During the trial of the Petitioner, State's Exhibit No. 18, the report of Rocky Lane, firearms and toolmark expert, was admitted into evidence. In that Mr. Lane was deceased at the time of trial, State's Exhibit No. 18 was admitted through the testimony of Officer John Akers of the Oak Hill Police Department. Said report stated that the testing of State's Exhibit No. 2, the bullet recovered from the body of the victim, Donald Vest, and the testing of State's Exhibit No. 1, the Lorcin pistol admitted as evidence at trial, "could not be identified with each other." Trial Transcript Volume II, page 456. Through the cross-examination of Officer Akers Petitioner's defense counsel clearly emphasized the inconclusive nature of the report. Trial Transcript Volume II, page 425.

45. During trial[,] defense counsel successfully moved for the suppression of certain documentary evidence due to late disclosure by the State. Trial Transcript Volume II, page 451.

46. During trial[,] defense counsel successfully moved for the suppression of documentary and testimonial evidence on grounds of incomplete chain of custody and lack of opportunity to confront and cross-examine a witness. Trial Transcript Volume II, pages 571-574.

47. During trial[,] Petitioner's defense counsel objected to the State's presentation of certain items of physical and testimonial evidence on Rule 404(b) grounds. In addressing said objections the Court:

   a. over-ruled Petitioner's objection to testimony regarding an alleged theft of a .38 caliber Lorcin pistol, the same caliber pistol as the pistol used in the murder of the victim, Donald Vest. Trial Transcript Volume II, page 331;

   b. overruled Petitioner's objection as to any testimony regarding an incident

37

involving the Petitioner which had
occurred at the home of Joey and Brenda
Elswick during the late evening hours of
December 31, 1999, just hours before
Donald Vest was murdered. Trial
Transcript Volume II pages 490, 511.

c.   overruled Petitioner's objection to the
testimony of Oak Hill Police Officer
Tygrett that he had received information
from a Dreama Dotson that the Petitioner
had been in North Carolina, did not meet
the criteria regarding 404(b) evidence.
Trial Transcript Volume III, page 631;

d.   sustained Petitioner's objection as to
any mention of the criminal charge which
led to the Petitioner's involvement with
law enforcement officers in North
Carolina. Trial Transcript Volume III,
page 634; and

e.   directed the State to avoid eliciting any
testimony concerning the Petitioner's
incarceration because of the
aforementioned Raleigh County capias.
Trial Transcript Volume III, page 865.

48.  At the conclusion of the State's case the
Petitioner's defense counsel moved the Court for a
judgment of acquittal on both counts of the
indictment, arguing that the evidence presented by
the State did not meet the first degree murder
criteria of a "deliberate, premeditated,
intentional killing," and that the State then
proceeded to trial on a different theory of felony
murder; that insufficient evidence was presented to
demonstrate the requisite intent for an attempted
or completed robbery; that an attempted robbery is
insufficient to support a felony murder charge; and
the State had failed to demonstrate the
Petitioner's intent to permanently deprive the
victim of his vehicle as required for a conviction
for robbery. The Court denied said motion for
judgment of acquittal, finding that murder may be
charged in the first degree with a companion charge
of robbery, or as one count of murder as a result
of aggravated robbery,, but there can only be one
conviction though there are two counts in an

indictment; that attempted robbery is a lesser
included offense within robbery and that sufficient
evidence was presented regarding the vehicle being
taken for the State to be able to argue, and for
the jury to decide whether, beyond a reasonable
doubt, that the victim was placed in fear of bodily
harm, that personal property, including his
vehicle, was taken from him, and that the victim
was shot and killed by the Petitioner during the
Petitioner's act of taking the vehicle away from
the victim.

(# 11, Ex. 6 at 8-11).

After identifying the <u>Strickland</u> standard, and the equivalent
West Virginia authority, as the applicable precedent, the state
habeas court then made the following conclusions of law:

7.   The Court concludes that many of the aforementioned
allegations raised by the Petitioner, as summarized
in paragraph A herein, allege that trial counsel
was ineffective.

8.   The Court (the same Court which tried the
underlying criminal case), applying the above clear
and settled law to the above found facts, concludes
that the allegations of ineffective assistance of
counsel, raised by Petitioner herein, generally
question or challenge strategic, tactical trial
decisions made by two, cooperating, experienced
trial lawyers during the underlying criminal
proceeding.

9.   The Court concludes that, given the facts and
circumstances of the case, trial counsel made
strategic, tactical decisions throughout the
underlying criminal proceeding which were clearly
aggressive, pro-active, zealous, reasonable and
certainly in no wise deficient.  Trial counsel was
extremely diligent and professional in their
preparation and defense of the Petitioner, filing
numerous motions to suppress physical evidence, and
after losing said motions, successfully pursued
suppression of said evidence under alternative
theories, which was upheld by the Supreme Court of
Appeals of West Virginia.  Petitioner's counsel
thoroughly and carefully cross-examined the

39

witnesses presented by the State, were diligent in
raising evidentiary objections, and were very
thorough in their presentation of the Petitioner's
defense.    Thus, the Petitioner's trial counsel
were, notwithstanding the guilty verdict and
resultant sentence, very effective counsel.  Given
the facts of the case, and the State's substantial
and convincing evidence in the case, trial
counsels' conduct clearly did not fall below any
objective standard of reasonableness for criminal
defense attorneys and the Petitioner's allegations
of ineffective assistance of counsel are wholly
without substance or merit.    Further, several
months prior to trial the Petitioner's trial
counsel had successfully negotiated a plea
agreement which was very favorable to the
Petitioner.  Had the agreement been consummated by
the entry of a guilty plea it would have resulted
in a concurrent sentence, with sentence(s)
previously imposed, that, barring any other
intervening factors, would have culminated in the
Petitioner's eligibility for parole in (ten) years.
Clearly, considering the Petitioner's criminal
record, ineffective trial counsel could not have
negotiated and obtained a plea agreement as
favorable to the Petitioner as was the
aforementioned agreement.

(Id. at 14-15).

The failure to call witnesses is a tactical decision which

generally does not amount to ineffective assistance of counsel.

See Goodson v. United States, 564 F.2d 1071, 1072 (4th Cir. 1977).

Furthermore, ineffective assistance is not shown where witnesses

who were not called to testify would not have helped the defense.

See Jones v. Taylor, 547 F.2d 808, 810-811 (4th Cir. 1977).

Petitioner merely speculates that testimony of the named witnesses

that were not called by his counsel as defense witnesses would have

changed the outcome of his trial.  Based upon a review of the

entire record, the undersigned proposes that the presiding District

Judge **FIND** that the decision of Petitioner's counsel not to call certain witnesses at trial was a matter of trial strategy, and that the decision was objectively reasonable under the totality of the circumstances.

It is also well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. Petitioner has not shown that his counsel's choices were anything other than trial strategy; nor has he demonstrated that his counsels' conduct fell below an objective standard of reasonableness.

Moreover, Petitioner has not shown that there is a reasonable probability that, but for counsels' alleged unprofessional errors, the result of the proceeding would have been different. Thus, the court proposes that the District Court **FIND** that Petitioner has not made a sufficient showing of ineffective assistance of counsel based upon these grounds.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that state habeas courts' decisions denying Petitioner habeas corpus relief on the basis of ineffective assistance of counsel were neither contrary to, nor an unreasonable application of, clearly-established Federal law, and that Respondent is entitled to judgment as a matter of law on each of Petitioner's claims of ineffective assistance of counsel as raised in Ground Three of his section 2254 petition.

**E.   Bifurcation of penalty phase of trial.**

In Ground Four of his section 2254 petition, Petitioner alleges that the trial court abused its discretion when it granted the State's motion to bifurcate Petitioner's trial in order to present evidence to the jury in the penalty phase of the trial that would not otherwise be admissible in a first degree murder trial. (# 1 at 57).  This section of Petitioner's section 2254 petition appears to be an excerpt of a brief filed in the SCAWV.  (Id. at 57-60).

Petitioner cites West Virginia case law indicating that the issue of bifurcation is within the discretion of the trial court, see Syl. Pt. 4, State v. LaRock, 470 S.E.2d 613 (W. Va. 1996), and that "bifurcation of a mercy phase is not an open door to the expansion of the ambit of evidence the prosecution may put on . . ."  State v. Rygh, 524 S.E.2d 447, 449 n.1 (W. Va. 1999). Petitioner asserts that the Rygh court further noted that there may be Equal Protection and Due Process problems "if one defendant were tried in a bifurcated proceeding with relaxed evidentiary limitations - as opposed to another defendant who is tried in a unitary proceeding."  524 S.E.2d at 449 n.1 (Id. at 57-58).

Petitioner's petition further states:

>      After the State filed a threadbare motion simply asking for bifurcation "in the interest of justice," (State's Motion for Bifurcation filed 9/19/02) and the defense responded that the state clearly had not fulfilled its burden under LaRock, (Defense Response In Opposition to Motion for Bifurcation filed 1/21/03 [footnote omitted]), the Trial Court took up the issue at

a February 21, 2003 hearing.  At this hearing, the
prosecutor pointed out that "During the trial of this
matter, if a unitary trial is held, the defendant's
record of convictions is normally not admissible during
the trial, if it's held in a unitary fashion."  (2/21/03
Hearing Transcript at 85.)  The prosecutor continued with
his concern that "[The defense will] bring Mr. Menei in
here with a nice suit and a nice haircut . . ." and
further that "the jury needs to have this additional
information to make a reasonable determination as to
whether or not he should be extended mercy."  (<u>Id.</u> at
86.)

     The defense then brought up footnote 1 of <u>Ryqh</u>,
arguing that bifurcation for the purpose of admitting
otherwise inadmissible evidence was beyond the Trial
Court's discretion . . . .  The Trial Court then
interrogated defense counsel as to the "fairness" of not
allowing the jury to hear the prior conviction evidence.
(<u>Id.</u> at 95.)  The Trial Court concluded that "this Court
feels that in order for a jury to fully and fairly make
an informed decision as to whether [mercy should be
granted], they should have before them the entire record.
And for those reasons the motion to bifurcate is
granted."  (<u>Id.</u> at 97.)

                         * * *

     As the bifurcation of the trial does not change the
rules of evidence, and as the moving party must supply
some legitimate reason for the bifurcation, the Trial
Court abused its discretion in granting the motion to
bifurcate for the specific purpose of allowing otherwise
inadmissible evidence.  Allowing such evidence to be
admitted based on the discretion of the trial court is in
effect creating a situation where identically situated
individuals are treated differently.  This violates
Thomas Menei's Equal Protection right under the West
Virginia and United States Constitutions.  <u>See</u> Syl. Pt.
11, <u>Mircus [sic; Marcus] v. Holley</u>, 217 W. Va. 508, 618
S.E.2d 517 (2005); <u>See also</u> <u>City of Clerburne [sic;
Cleburne v. City of Clervurne [sic; Cleburne] Living
Center</u>, 473 U.S. 432, 439 (1985) ("The Equal Protection
Clause of the Fourteenth Amendment . . . is essentially
a direction that all persons similarly situated should be
treated alike.") Furthermore, this Court has held a mercy
determination to be within the sole discretion of the
jury to the extent that factors for such a decision are
not laid out for the jury in an instruction.  <u>See</u> Syl.

> Pt. 1, <u>State v. Miller</u>, 178 W. Va. 618, 363 S.E.2d 504
> (1987). Thus, if a judge be permitted discretion to
> bifurcate a trial for the purpose of changing the scope
> of admissible evidence for a mercy determination, that
> Judge in effect makes an arbitrary decision with no
> grounding in law.
>
> Furthermore, such a bifurcation is a more direct
> violation of the prohibition against setting out factors
> for a jury to consider when deciding whether a defendant
> receives mercy. By bifurcating the trial to specifically
> allow evidence regarding Menei's criminal history the
> Trial Court implied that the jury should consider Menei's
> criminal history by going out of its way to present that
> evidence.
>
> As the Trial Court's bifurcating the trial was an
> abuse of discretion under <u>LaRock</u> and <u>Rygh</u>, violated
> Menei's Equal Protection rights under the West Virginia
> and United States Constitution, and was contrary to the
> prohibition against setting out mercy factors as
> discussed in <u>Miller</u>, Menei's conviction thus must be
> reversed and remanded to the Fayette County Circuit Court
> for a unitary trial.

(<u>Id.</u> at 58-60).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment asserts that this claim is challenging the state

court's application of state court rules and case law, which cannot

form a basis for federal relief. (# 12 at 28-29). Respondent

adds, "[n]o federal authority has yet to hold that West Virginia's

bifurcated sentencing proceedings or applicable rules of evidence

are unconstitutional." (<u>Id.</u> at 29). The Memorandum further

argues:

> Moreover, the evidence introduced by the State in
> the bifurcated sentencing was indeed prejudicial. That's
> why the state sought to introduce it. It was not,
> however, unfairly prejudicial or introduced in violation
> of controlling federal precedent. "All evidence is
> prejudicial or it is not material. To warrant reversal,

44

the prejudice must be unfair." <u>United States v. Rocha</u>,
916 F.2d 219, 249 (5th Cir. 1990); <u>Cf.</u> <u>United States v.</u>
<u>Pitrone</u>, 115 F.3d 1, 8 (1st Cir. 1997)("Virtually all
evidence is prejudicial -- if the truth be told, that is
almost always why the proponent seeks to introduce it --
but it is only unfair prejudice against which the law
protects.").

As a challenge to the ruling of the trial court
under state court law and evidentiary rules, this claim
cannot form the basis for federal relief.  Nor has
Petitioner demonstrated that the state court's findings
on this claim were contrary to any federal controlling
authority nor did he cite to any applicable authority on
this issue. [FN 2 omitted].

(<u>Id.</u> at 30).

The state habeas court addressed the presentation and use of

Petitioner's past convictions as evidence in the mercy phase of

Petitioner's trial under state evidentiary rules, particularly

Rules 404(b) and 403.  The state habeas court's findings of fact

concerning this issue are as follows:

21.  By Order entered March 3, 2003, the Petitioner's
motion to suppress items seized through search
warrants was denied.  The Court further granted the
motion of the State to bifurcate the Petitioner's
trial into guilt and mercy phases, finding that
"the defendant's extensive criminal history should
be information given to the jury deciding the issue
of mercy, due to the fact that such information is
necessary for an informed discussion as to whether
or not the jury should extend mercy to the
defendant in this matter."

22.  On March 6, 2003, the Petitioner filed a motion to
preclude any introduction at trial evidence of his
prior criminal record.

* * *

24.  By Order entered April 7, 2003 * * * the Court
found the Petitioner's motion to preclude

introduction of his prior criminal record at trial
to be premature, and the issue to be addressed
prior to or during the penalty phase of the trial,
if the defendant was convicted of first degree
murder.

* * *

50. Following the return of the verdict in this matter,
the Court proceeded with the bifurcated "mercy
phase" of trial.

51. After *in camera* argument presented by the
Petitioner's counsel, and the response proffered by
the State, the Court ruled on the Petitioner's
motion to preclude introduction of his prior
criminal record at trial, finding that the
Petitioner had been convicted of a crime of
violence, and as such, the State was permitted,
during the mercy phase of the case, to present the
Petitioner's prior record of committing crimes of
physical violence, including his conviction by way
of plea of guilty to aggravated robbery, his
conviction for aiding and abetting as a principal
in the second degree to non-aggravated robbery, and
his conviction for the felony crime of unlawful
assault. The Court granted the Petitioner's motion
to preclude the State from using evidence of his
past conviction of manufacturing a controlled
substance, any prior matters dealing with the
revocation of parole, and his conviction for escape
from jail.

52. By its decision returned June 8, 2004, the trial
jury recommended that the Petitioner "not receive
mercy" at sentencing.

(# 11, Ex. 6 at 5, 11-12).  The state habeas court then made the

following conclusions of law:

16. Further, Petitioner's ground as summarized in
paragraph D herein (the presentation and use of the
past convictions of the Petitioner during the mercy
phase of the underlying trial proceedings) is
wholly without merit. In State v. LaRock, 196 W.
Va. 294, 470 S.E.2d 613 (1996), the Court explained
the standard of review for a Rule 404(b) issue as
follows: "The standard of review for a trial

46

court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review de novo whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than prejudicial under Rule 403." The Trial Court reviewed the criminal record of the Petitioner *in camera*, the State presented a legitimate purpose for its use, and the Court then limited the evidence to those acts with probative value (crimes of violence) for the jury's determination of a recommendation of mercy or no mercy. The Petitioner's prior criminal record involving non-violent crimes the Court did not permit the State to present to the jury.

(Id. at 17-18).

Ground Four of Petitioner's section 2254 petition largely concerns an alleged abuse of discretion by the trial court and rests on matters of state evidentiary law. Such issues are not cognizable in federal habeas corpus.

To the extent that Petitioner has alleged that the bifurcation of his trial to enable the use of his convictions of crimes of violence in the mercy phase implicates the Equal Protection Clause of the United States Constitution (the only federal claim asserted in Ground Four), Petitioner's claim lacks merit. Petitioner has latched onto one sentence in a state court opinion stating that discretionary bifurcation "could raise, inter alia, equal protection and due process issues, if one defendant were tried in a bifurcated proceeding with relaxed evidentiary limitations - as opposed to another defendant, who is tried in a unitary

47

proceeding." <u>Rygh</u>, 524 S.E.2d at 449.  This could occur only in a context where two defendants, who are charged with the same crime, are tried separately, with one trial being unitary and the other bifurcated.  Petitioner has not drawn a comparison sufficient to demonstrate any sort of equal protection problem with the bifurcation of his trial.  Moreover, Petitioner has not pled, nor demonstrated that the use of his prior convictions in the mercy phase of his trial violated his due process rights, or in any way resulted in an unfair trial.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner's claim as pled in Ground Four of his section 2254 petition, fails to demonstrate any violation of his federal constitutional rights.  The undersigned further proposes that the presiding District Judge **FIND** that the state court's decision denying habeas corpus relief was neither contrary to, nor an unreasonable application of, clearly established federal law. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that there is no genuine issue of material fact concerning this claim, and that Respondent is entitled to judgment as a matter of law on this claim.

**F.   Ground Five - <u>Brady</u> claim.**

In Ground Five of his section 2254 petition, Petitioner contends that the trial court erred in denying Petitioner's motion for a new trial based upon newly discovered evidence, which

48

Petitioner contends was favorable to the defense, in violation of his due process rights.  (# 1 at 61).  In particular, Petitioner asserts as follows:

> On the evening of June 1, 2004, Sergeant Chip Bennett and Trooper First Class R. C. Workman of the Oak Hill Detachment of the West Virginia State Police interviewed Darrell Cadle at the Southern Regional Jail, and memorialized the interview with an audio-recording device. (9/21/05 Order at 4.)  Trial defense counsel was not given a copy of this statement nor notified as to its existence prior to trial.  (Id. at 5.)  Neither side subpoenaed Darrell Cadle to testify at trial.  (Id.)  On July 19, 2004, the Trial Court relieved trial counsel and appointed the Kanawha County Public Defender Appellate Division ("appellate defense counsel") as counsel for Menei.  (Id. at 6.)  Appellate defense counsel discovered the existence of the above statement and requested a copy of same.  (Id. at 6-7).  A transcript of the statement was provided to appellate defense counsel on September 30, 2004, and a copy of the audiotape was provided on January 8, 2005.  (Id.)  As the Dotson statement contradicted the testimony of Jeanette Dotson as to several points, appellate defense counsel filed a motion for a new trial based on the discovery of the evidence not turned over by the state.  (Id. at 7.)  On February 16, 2005, Cadle testified consistent with his statement of June 1, 2004.  (Id.)

> On September 21, 2005, the Trial Court entered an order denying Menei's motion for a new trial.  The Trial Court erred as the Trial Court applied the incorrect legal standard as to the materiality of the undisclosed evidence, and did not correctly weigh the impeachment value of the undisclosed evidence.

(Id.)

Petitioner first asserts that the trial court applied the incorrect legal standard as to the one element at issue; that is, the materiality of the evidence that was not disclosed.  (Id. at 62-63, 65-66).  As noted by Petitioner, in Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that "the suppression by

the prosecution of evidence favorable to an accused upon request
violates due process where the evidence is material either to guilt
or to punishment."

In <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), the
court made clear that impeachment evidence also falls within the
<u>Brady</u> rule.   The <u>Bagley</u> Court also clarified the standard for
determining the materiality of evidence under <u>Brady</u>, requiring that
there be a "reasonable probability that, had the evidence been
disclosed to the defense, the result of the proceeding would be
different." <u>Id.</u> at 682. Petitioner further notes that in <u>Kyles v.
Whitley</u>, the Supreme Court emphasized that the <u>Bagley</u> standard was
not a "sufficiency of the evidence" test, but, rather, centered on
the confidence in the outcome of the proceedings.  514 U.S. 419,
434 (1995).  (# 1 at 65).

Thus, in order to succeed with a <u>Brady</u> claim, Petitioner must
establish that evidence that was favorable to him, either because
it is exculpatory or impeaching, must have been suppressed by the
State, either willfully or inadvertently, and prejudice must have
ensued.   <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999).
Petitioner contends that the first two elements are not in dispute
concerning the failure to disclose the Cadle statement.  (<u>Id.</u> at
64).

Petitioner contends that Cadle's statement was favorable to
his defense because it was both exculpatory and could be used for
impeachment purposes.  Petitioner states:

> There are two portions of the undisclosed statement Menei
> contends contains impeachment evidence.  On page 3 of the
> transcript[,] Cadle states the he, Jeanette Dotson and
> Thomas Menei hitchhiked to North Carolina (Motion Exhibit
> A.)  On pages 4 and 5, Cadle specifically denies that
> Menei took a gun to North Carolina.  (Id.)
>
>     This statement contradicts the trial testimony of
> Jeanette Dotson.  Dotson testified that Raymond Menei
> drove her, the defendant and Cadle to North Carolina.
> (Tr. Trans. at 871.)  She also testified that Menei took
> the gun with him to North Carolina.  (Tr. Trans. at 873.)
> Thus, Cadle's statements constitute impeachment evidence
> as to Dotson's testimony.  See State v. Hall 174 W. Va.
> 787, 791, 329 S.E.2d 860, 864 (1985)("Another technique
> [of impeachment] is to offer a witness whose testimony is
> inconsistent with the first witness's").

(Id.)

It is undisputed that the Cadle statement was taken just before Petitioner's trial began and that it was not turned over to the defense before or during the trial.  As noted by Petitioner, at the initial hearing on Defendant's Motion for a New Trial on January 19, 2005, the Prosecutor admitted that he relied upon the representations of the officers who took the statement that the evidence was not exculpatory, and did not turn over the statement. (9/21/05 Order at 7.) (Id. at 64-65).

Petitioner then contends that the trial court used the wrong legal standard in determining the materiality of the Cadle statement and further failed to give proper weight to it as impeachment evidence.  (Id. at 65-66).  The section 2254 petition states:

>     The Trial Court, however, failed to apply the
> "reasonable likelihood" test.  The Trial Court cites

language from <u>United States v. Agurs</u>, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976), an earlier decision which held that "[t]he proper standard for materiality for undisclosed evidence is that constitutional error has been committed if the omitted evidence creates a reasonable doubt of guilt that did not otherwise exist." (9/21/05 order at 10.)  While the later cases did not specifically overrule <u>Agurs</u> as to materiality, these cases do in fact specifically "clarify" the standard used, and the Trial Court failed to note some of these clarifications.  The Trial Court found that the evidence "would not have created a reasonable doubt that did not otherwise exist."  (9/21/05 Order at 10.)  The correct standard is whether the evidence would have had a reasonable likelihood of affecting the jury verdict. <u>State v. Salmons</u>, 203 W. Va. 561, 509 S.E.2d 842 (1998); see also <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985) (stating materiality standard as "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would be different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome").

As the Trial Court used the standard set out in <u>Agurs</u> rather than the updated versions in <u>Bagley</u>, <u>Kyles</u> and <u>Salmon[s]</u>, the Trial Court failed to apply the correct law in determining the materiality of the withheld evidence.

(# 1 at 66.)

Concerning the weight given to the impeachment value of Cadle's statement, Petitioner argues:

In denying defendant's motion for a new trial, the Trial Court noted that the statement "was relevant only to the issue of flight to North Carolina three months after the murder."  This completely ignores the impeachment aspect of Cadle's possible testimony. As set out above, Cadle's statement contradicted Dotson's testimony as to several key facts.

At trial, a significant point of contention was the events of the night of the murder.  Dotson testified that as far as she could tell Menei could have left the apartment at a time that would have allowed him to commit the murder.  (Tr. Trans. at 857.)  However, Raymond

52

Menei, Thomas Menei's father, testified that he was with
his son at the apartment during the time, and in fact it
was Dotson that left.  (Id. at 969-971.)  The State's
purpose for interviewing Cadle was to find a separate
witness that could corroborate Dotson's testimony as to
the North Carolina trip in order to impeach Raymond
Menei.[3]  (9/21/05 order at 4.)  However, Cadle gave a
statement consistent with Raymond Menei's denial of
involvement with the trip, and the State decided to not
notify the defense.  (Id.)

(Id. at 67).  Petitioner contends that it is "beyond dispute" that

the failure to turn over this impeachment evidence is a violation

of his due process rights.  Petitioner adds:

It is also beyond dispute that Jeanette Dotson's
testimony and credibility were central to the State's
case.  She was referred to as the "most important part of
this puzzle" by the State in closing argument.  (Tr.
Trans. at 1061.)  Dotson testified that Thomas Menei was
out of the apartment at the time of the killing and that
Thomas Menei allegedly told Dotson later that morning
that he had just killed a man.  (Tr. Trans. at 1062-3.)
Other than Dotson's testimony, the State's case consisted
of the gun allegedly owned by Thomas Menei's bother,
Mickey, although Mickey could only testify that the gun
was similar and consistent to the one he had owned.  (Tr.
Trans. 579, 584.)  The state attempted to trace this gun
to North Carolina via Dotson's testimony and the
testimony of officers that a person alleged to be Thomas
Menei, a person who identified himself as "Timmy Dotson,"
was found in close proximity to the gun.  (Id. at 788,
790.)  The state tried to complete the linkage by expert
ballistic evidence, but the State ballistics examiner
could not establish the gun retrieved as the gun used in
the killing[].  (States Exhibit 18.)  Only after the gun
and bullet were, after spending five days in an officer's
gun locker (rather than a logged evidence locker), (Tr.
Trans. at 668,) sent to the F.B.I. crime laboratory was
the State able to present ballistics testimony that the
gun was in fact the gun used to kill Donald Vest.  (Id.
at 702.)  However, because the bullet was now a different
weight, the F.B.I. expert conceded that it was possible

---

[3]  Raymond Menei testified that he did not drive the threesome
to North Carolina.

that he was examining a different bullet.  (Tr. Trans. at 737.)

As the State's attempt to link Thomas Menei to the shooting by means of the gun suffered from several weaknesses, the State was correct to argue that Jeanette Dotson's testimony was "the one piece that seems to be in the center, that finally tells what the picture is." (Tr. Trans. at 1061.)  If the jury were to disregard the testimony of Dotson, the State had no statement from Thomas Menei confessing to the murder, and the testimony of Raymond Menei that Thomas Menei was with him at the time of the murders would be uncontested.

(Id. at 68-69).

Petitioner further contends that Jeanette Dotson's testimony had "many indicia of unreliability."  (Id. at 69).  Dotson was given immunity for any involvement in the Vest murder, and avoided felony charges in lieu of a misdemeanor welfare fraud charge. Thus, Petitioner asserts that she benefitted greatly from being a favorable witness for the State.  (Id.)  Petitioner adds:

Cadle's possible testimony, if believed by the jury in full, would be clearly at least "insubstantial [sic; substantial?] additional impeachment" of Jeanette Dotson in that it would be the jury [who?] would [be?] determining that Dotson was lying about the case before them.  As instructed by the Trial Court, once the jury determines that a witness has been discredited or impeached by a showing that he or she has lied during her testimony, the jury "may believe such parts of their testimony as you believe to be true, and reject such parts as you believe to be false, or *you may refuse to believe any part of such testimony*."  (Tr. Trans. at 1042.) [Emphasis added by Petitioner].

Therefore, Cadle's testimony, if believed, could lead the jury to totally reject the testimony of the only witness to claim Menei confessed to the murder.  That alone, the elimination of a claimed confession, obviously would create a reasonable probability that the result of the trial would be different, in that removal of a confession would undermine public confidence in the

54

outcome.  This is even more likely in this case, a case
where the State's physical evidence had several holes, a
case where the prosecutor in a petition to [the SCAWV]
claimed that an earlier Trial Court suppression decision
left him in a position where he could not successfully
prosecute Thomas Menei for murder . . . .

As the suppression of the evidence in question [the
Cadle statement] created a reasonable probability that
the result would have been different in that the
suppression would undermine public confidence in the
verdict, Thomas Menei's Due Process rights under the West
Virginia and United States Constitution were violated,
and Thomas Menei is entitled to a new trial in which he
will be permitted his right to present this evidence, a
right the State summarily denied him.

(Id. at 69-70).

Respondent's Memorandum of Law in support of his Motion for

Summary Judgment addressed this claim as follows:

During the preparation of the appeal in this case,
appellate counsel discovered a statement given to
investigators by Darrell Cadle (Resp't Ex. 11.)  The
statement, not previously transcribed or submitted during
discovery, contained statements that did not corroborate
Jeanette Dotson's version of events surrounding
Petitioner's trip to North Carolina.  Among Cadle's
statements were that he did not see the murder weapon or
hear Petitioner admit killing Mr. Vest.  When appellate
counsel discovered the statements, they moved for a new
trial based on newly discovered evidence and for the
violation of Brady by the State.

After taking testimony and conducting three separate
hearings, the trial court denied the motion and found
that the statements did not warrant a new trial either as
newly discovered evidence or as exculpatory within the
meaning of Brady v. Maryland.  (Resp't Ex. 10.)

The trial court issued extensive findings of fact
based on the entire record and the evidence and argument
taken during the hearings on the motion for a new trial.
As such, the findings of the trial court are entitled to
a presumption of correctness. * * *

55

After setting forth the standards enunciated in
<u>Brady</u>, the trial court found that Cadle's statements were
neither sufficiently material to be exculpatory nor
intentionally withheld by the State.  The trial court
also noted that Cadle was available and known by the
defense prior to trial, as a potential witness.  The
court cited to a recorded transcript of a call between
Cadle and Petitioner's mother recorded prior to trial
while Cadle was incarcerated on unrelated charges.
During the call, Cadle informed Petitioner's mother that
he'd been questioned by investigators and had been in
contact with trial counsel about testifying.  Cadle also
told Petitioner's mother he would testify on behalf of
Petitioner if asked.  (Resp't Ex. 11 at 8.)

The court concluded:

Despite the fact that the June 1, 2004 Cadle
statement which the State failed to disclose
or provide to the Defendant's trial counsel,
could arguably have been used by the defense
as impeachment evidence or in the cross
examination of Dotson, it was not material to
either the Defendant's guilt or to his
punishment.  The Cadle statement could not,
even if believed in its entirety, create a
reasonable doubt as to the Defendant's guilt.
The Cadle statement was relative only to the
issue of Defendant's flight to North
Carolin[a] three months after the murder of
Donald Vest, and therefore not exculpatory as
a matter of law under <u>Brady v. Maryland</u>.

([# 11, Ex. 10] at 10.)

(# 12 at 31-32).

Respondent argues that Petitioner has "provided no substantive

argument to rebut the presumption that the trial court's

application of <u>Brady</u> to the facts of the case were correct as a

matter of law.  (<u>Id.</u> at 33).  Respondent further asserts:

Petitioner fails to argue how the statements of Cadle
were sufficiently material to overcome the remaining
evidence of guilt corroborating Dotson's testimony
including the recovery of the murder weapon and the keys

belonging to Mr. Vest's vehicle.  Rather than impeaching the testimony of Dotson[], Cadle's [statement] simply refused to corroborate Dotson's version of events.  Also, as noted by the trial court, Cadle lacked credibility.

Petitioner also fails to argue how the evidence was newly discovered when the record shows that Cadle had contacted Petitioner's family and told them about giving the statement and offering to testify for the defense. Petitioner argues that Cadle's statements could have shifted suspicion to Dotson but fails to account for the evidence tying him to the scene of the murder.  Rather Petitioner's argument hinges almost solely on the fact that the State failed to disclose evidence that may or may not have been helpful to the defense.  This is insufficient to demonstrate the trial court improperly applied <u>Brady</u>.  "The mere possibility that an item of undisclosed information might have helped the defense . . . does not establish 'materiality' in the constitutional sense."  <u>United States v. Agurs</u>, 427 U.S. 97, 109-110 (1976).

(<u>Id.</u> at 32-33).  Respondent further asserts that <u>Brady</u> "does not relieve a defendant from being diligent in presenting his own case" and that Cadle was available and known to the defense as having been in North Carolina with Petitioner and Dotson.  (<u>Id.</u> at 33).

The undersigned has reviewed the Order denying Petitioner's Motion for New Trial, which is produced in the record as Respondent's Exhibit 10.  The trial court made the following pertinent findings of fact:

14.  Subsequent to obtaining the aforementioned tape-recorded statement from Cadle, Sergeant Bennett discussed the general content of said statement, by telephone, with Prosecuting Attorney Blake. Sergeant Bennett informed the prosecutor that Cadle said that he, the Defendant, and Dotson hitchhiked to North Carolina in March 2000.  Sergeant Bennett additionally informed the prosecutor that Cadle said that he saw no one with a gun and that the Defendant did not say anything to him about the murder of Donald Vest.

57

15.   After his conversation with Sergeant Bennett, the prosecutor decided that Cadle would not be used as a witness for the State of West Virginia to impeach the expected testimony of Raymond Menei or for any other trial purpose at the Defendant's murder trial.

* * *

17.   The State claims that it did not disclose any information regarding the Cadle interview to Defendant's trial counsel, at the time of the trial, because Cadle was purportedly a friend of the Defendant, and if the information from Cadle's interview was correct, then the State believed that the Defendant was already aware that Cadle had accompanied Dotson and him to North Carolina in March 2000.   The State further claims that it assumed that the Defendant would provide Cadle's name to his trial counsel and therefore expected that the defense would subpoena Cadle to testify at trial.

18.   Neither the State nor the Defendant subpoenaed Cadle to testify at the Defendant's murder trial.

* * *

27.   On February 16, 2005, a hearing was held at which time the Court heard sworn testimony from Cadle, This testimony was consistent with the tape-recorded statement that he gave to the West Virginia State Police on June 1, 2004.

* * *

29.   At the conclusion of Cadle's testimony, the State played for the Court a Southern Regional Jail audio recording of a telephone conversation from the evening of June 1, 2004, between Cadle and Mrs. Raymond Menei, the Defendant's mother.   Cadle called the Menei residence from the Southern Regional Jail and asked to speak with Raymond Menei, the Defendant's father.   Raymond Menei, for some undetermined reason, did not come to the telephone.   The aforementioned recording nevertheless depicts Cadle telling Mrs. Menei the following, in relevant part: "The State Police come

58

> (sic) up here just now asking about that murder and
> stuff.  I figured I'd tell Raymond 'cause (sic) I
> told his lawyer and signed a paper that I would
> testify for Tommy."

(# 11, Ex. 10 at 4-8).

Relying upon <u>Brady</u>, <u>Strickler</u>, <u>Bagley</u> and <u>Agurs</u> as discussed
above, the trial court made the following conclusions of law:

> 6.    In determining whether the state's failure to
> disclose evidence to the defense denied the
> defendant a fair trial, the proper standard of
> materiality for undisclosed evidence is that
> constitutional error has been committed if the
> omitted evidence creates a reasonable doubt of
> guilt that did not otherwise exist. <u>U.S. v. Agurs</u>,
> 427 U.S. 97 (1976).

> 7.    Despite the fact that the June 1, 2004 Cadle
> statement, which the State failed to disclose or
> provide to the Defendant's trial counsel, could
> arguably have been used by the defense as
> impeachment evidence or in the cross examination of
> Dotson, it was not material to either the
> Defendant's guilt or to his punishment.  The Cadle
> statement could not, even if believed in its
> entirety, create a reasonable doubt as to the
> Defendant's guilt.  The Cadle statement was
> relative only to the issue of the Defendant's
> flight to North Carolina three months after the
> murder of Donald Vest, and was therefore not
> exculpatory as a matter of law under <u>Brady v.
> Maryland</u>.

> 8.    The Court concludes that the State's failure to
> disclose the Cadle statement did not rise to the
> level of a constitutional error because the
> evidence, evaluated in a light most favorable to
> the Defendant, would not have created a reasonable
> doubt of guilt that did not otherwise exist.  Said
> statement was relevant only to the issue of the
> manner of flight to North Carolina three months
> after the murder.

(<u>Id.</u> at 10).  On this basis, the trial court concluded that "the
State's failure to disclose the Cadle statement did not, in any

59

manner, hinder, impede, or otherwise interfere with the Defendant's trial counsel's duty and ability to fully, fairly, and vigorously represent and defend the Defendant" and denied the Motion for a New Trial. (Id. at 11).

The state habeas court made the following findings of fact concerning the trial court's denial of the Motion for a New Trial:

54. On December 7, 2004, the Petitioner filed a Motion for a New Trial, raising as grounds in support thereof, the failure of the State to disclose exculpatory evidence to the Petitioner, to wit, a statement obtained from a potential witness, Darrell Cadle Jr., whose statement contradicted testimony presented in the State's case in chief.

55. On January 19, 2005, February 16, 2005, and June 21, 2005, a series of hearings were held to address the Defendant's Motion for a New Trial.

56. By Order entered September 21, 2005, the Petitioner's motion for a new trial was denied. The Court found that despite the fact that the statement "arguably could have been used by the defense as impeachment evidence or in the cross-examination of [Jeanette] Dotson, it was not material to either the Defendant's guilt or to his punishment." The Court found that although the State's failure to disclose said statement was clearly and absolutely without justification, it "did not rise to the level of a constitutional error because the evidence, evaluated in a light most favorable to the Defendant, would not have created a reasonable doubt of guilt that did not otherwise exist. Said evidence was relevant only to the issue of the manner of flight to North Carolina three months after the murder." The Court concluded that the "evidence presented during the Defendant's trial was clearly sufficient, believable, and credible so as to permit a reasonable, fair and impartial jury of twelve to conclude that the Defendant was, beyond a reasonable doubt, guilty of murdering Donald Vest."

(# 11, Ex. 6 at 12-13). The findings of fact further indicated

that the SCAWV refused Petitioner's direct appeal, which raised the Brady claim therein.  (Id.)

The state habeas court's Order denying Petitioner's habeas corpus petition further concluded that this matter had been fully and fairly addressed by the trial court (which was the same circuit judge) when Petitioner's Motion for a New Trial was denied and that Petitioner had not demonstrated that the trial court's decision was clearly wrong.  (Id. at 16-17).

Petitioner's claim for relief rests on his contention that the trial court applied the wrong standard of materiality because the court cited to the standard set forth in United States v. Agurs, 427 U.S. 97 (1976).  In Agurs, the Supreme Court set forth three different standards for determining whether suppressed or undisclosed evidence was material so as to deny a defendant his due process right to a fair trial.  The third of those standards was applicable when the defendant failed to request or only generally requested the disclosure of exculpatory evidence.  The Agurs Court stated that, in that situation, reversal of a conviction was necessary if the undisclosed evidence "creates a reasonable doubt that did not otherwise exist."  Id. at 112.

However, in United States v. Bagley, 473 U.S. 667 (1985), the Supreme Court set forth a new standard for determining when the withholding of Brady materials requires the reversal of a conviction.  There, the Court held that a conviction must be reversed only if evidence is material in the sense that its

61

suppression "undermines confidence in the outcome of the trial" or in other words, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. The undersigned notes that the trial court's Order denying the Motion for a New Trial also cites the Bagley standard.

Even if the trial court applied the Agurs standard for determining the materiality of the Cadle statement in Petitioner's case, the Cadle statement was not material to Petitioner's guilt or punishment under the Bagley standard either. While Cadle's statement may have had some impeachment value because it contradicts Dotson's testimony on certain points, there is nothing in the Cadle statement that is relevant to whether or not Petitioner killed Donald Vest. The statement, at most, only established that Cadle had no personal knowledge that Petitioner had committed the crime, and that he never saw Petitioner with a gun while they were in North Carolina.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that there is no reasonable probability that, had the Cadle statement been disclosed to the defense, the result of the proceeding would have been different. Thus, the undersigned further proposes that the presiding District Judge **FIND** that the State's failure to disclose the Cadle statement did not rise to the level of a constitutional error under Brady and its progeny. Moreover, the undersigned proposes that the presiding District

62

Judge **FIND** that the state courts' decisions on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and that Respondent is entitled to judgment as a matter of law on Ground Five of Petitioner's section 2254 petition.

**<u>RECOMMENDATION</u>**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's Motion for Stay and Abeyance (# 18), **GRANT** Respondent's Motion for Summary Judgment and to Dismiss the Petition (# 11), and dismiss this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(C), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing), from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of this Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be served on the opposing party and Judge Copenhaver.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and to transmit a copy to counsel of record.

    January 11, 2011
         Date

Mary E. Stanley
United States Magistrate Judge